# IN THE COURT OF APPEALS OF IOWA

No. 15-1256
Filed October 14, 2015

**IN THE INTEREST OF M.W. and Z.W.,**
    **Minor Children,**

**R.W., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Woodbury County, Julie A. Schumacher, District Associate Judge.


A mother appeals from a juvenile court order terminating her parental rights to two children.  **AFFIRMED IN PART AND REVERSED IN PART.**


David A. Dawson, Sioux City, until withdrawal, then Theresa Rachel of Deck Law, L.L.P., Sioux City, for mother.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, and Dewey Sloan, County Attorney, for appellee.

Michelle Hynes, Sioux City, for father.

Molly Joly of Vakulskas Law Firm, P.C., Sioux City, attorney and guardian ad litem for minor children.


Considered by Doyle, P.J., Bower, J., and Miller, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**MILLER, Senior Judge.**

Rebekah is the mother and Michael the father of Z.W. and M.W. ("the children").[1] Z.W. and M.W. were born in March 2012 and April 2013 respectively and thus were three and two years of age at the time of a May 2015 termination of parental rights hearing. Rebekah appeals from a July 2015 juvenile court order terminating her parental rights to the children. (The same order terminated Michael's parental rights to the children, and he has not appealed.) Rebekah also appeals orders in the underlying child in need of assistance cases. We affirm the termination of Rebekah's parental rights to M.W., and reverse the termination of her parental rights to Z.W.

On April 29, 2014, the children were removed from parental custody pursuant to an ex parte removal order. They were placed in the legal custody of the Iowa Department of Human Services (DHS) in whose legal custody they have thereafter remained. The State filed a child in need of assistance (CINA) petition on May 1, 2014, and an amended petition the next day.

The circumstances surrounding the children's removal are summarized in the juvenile court's findings of fact in the June 2, 2014 order following the May 29, 2014 combined temporary-removal hearing and hearing on the State's child in need of assistance (CINA) petition. Those findings are as follow:

> [M.W.] and [Z.W.] initially came to the attention of the [DHS] on or about April 29, 2014, when Father, Michael [], reported he woke up at noon to find infant [L.W.] with his eyes open, unmoving, and indicative of something being wrong. Mother was not at home

---

[1] Rebekah and Michael were also the parents of L.W., born in March 2014 and one-and-one-half months of age at the time of his death on April 29, 2014, as discussed hereafter.

at the time. The Father did not call 911. He did make a subsequent call to a relative of [L.W.] at approximately 2:00 p.m. Several hours after the Father discovered [L.W.], he was taken to the hospital in a filthy condition with sores under his neck and reeking of urine and feces. The hospital indicated he had been dead for approximately four hours. [L.W.] was approximately two months old at the time of his death. Based on the condition of the deceased infant, law enforcement proceeded to the residence of the parents to check on the safety of [M.W. and Z.W.]. Exhibit STATE011 is a record of various photos, portraying the condition of the home at the time of the arrival of law enforcement. The living conditions of [M.W. and Z.W.] and the now deceased infant, [L.W.], were deplorable. The conditions, which will be described by this court as unimaginable, portray feces, garbage, cat hair, and rotting food engulfing the residence. Garbage is stacked throughout the home. The floor of the residence is littered with garbage and cigarette butts. There are bottles of alcohol within the children's reach littered about the living room area. The bathroom area is filthy with toilet bowl cleaner clearly accessible to the children. The three young children's sleeping area is essentially a room with three cribs placed tightly together. The floor area surrounding those cribs is mounded with dirty diapers covered with gnats and flies. The cribs are extremely dirty. There are bugs in the refrigerator/freezer. Both [Z.W. and M.W.'s] hair stat tests were positive for illegal substances. Deceased baby [L.W.'s] hair stat test tested positive for amphetamines, methamphetamine, cannabinoids, carboxy-THC, and native THC. Law enforcement officers report a stench from outside of the apartment. The mother reports substance abuse issues by both parents.

As noted in the juvenile court's order terminating parental rights, L.W.'s autopsy report noted that L.W.

had a "wizened" appearance with skin tenting and sunken eyes, further noting failure to thrive with all growth parameters below the fifth percentile. The report further noted contusions and abrasions on the 2-month-old infant's hands, further noting the post-mortem chemistry was consistent with severe dehydration. The report indicated the cause of death as malnutrition and dehydration due to neglect, with manner of death being homicide.

The State's CINA petition and amended petition alleged the children were in need of assistance pursuant to Iowa Code sections 232.2(6)(b) (2013) (child

whose parent has physically abused or neglected the child, or is likely to abuse or neglect the child), 232.2(6)(c)(2) (child who has suffered or is imminently likely to suffer harmful effects as a result of the failure to the child's parent to exercise a reasonable degree of care in supervising the child), and 232.2(6)(n) (child whose parent's mental capacity or condition, imprisonment, or drug or alcohol abuse results in the child not receiving adequate care).

The juvenile court's June 2, 2014 order found the children to be "children in need of assistance pursuant to Iowa Code sections 232.2(6)(b), (c)(2), and (n)," the grounds alleged in the State's petition. The court's July 7, 2015 ruling ordered Rebekah's parental rights to Z.W. and M.W. terminated pursuant to Iowa Code sections 232.116(1)(d) and (i), and further ordered her parental rights to M.W. terminated pursuant to section 232.116(1)(h).

On appeal Rebekah contends, among other things, that the juvenile court erred in terminating her parental rights pursuant to Iowa Code sections 232.116(1)(d) and (i). She argues, as she did in the juvenile court, that the record does not contain clear and convincing evidence supporting an essential, required element of each of those two provisions.

Our review of a termination of parental rights proceeding is de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). We are not bound by the juvenile court's findings of fact, but we give them weight, especially when considering credibility of witnesses. Iowa R. App. P. 6.904(3)(g); *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). Grounds for termination of parental rights must be proved by clear and convincing evidence. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). "'Clear

and convincing' means there are no serious or substantial doubts as to the correctness [of the] conclusions of law drawn from the evidence." *C.B.*, 611 N.W.2d at 492 (citing *Raim v. Stancel*, 339 N.W.2d 621, 624 (Iowa Ct. App. 1983)).

> Our review of child in need of assistance proceedings is de novo. We review both the facts and the law, and we adjudicate rights anew. Although we give weight to the juvenile court's factual findings, we are not bound by them. As in all juvenile proceedings, our fundamental concern is the best interests of the child.

*In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001) (citations omitted).

In order to terminate parental rights pursuant to Iowa Code section 232.116(1)(d) the court must find, among other elements, that:

> The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.

Iowa Code § 232.116(1)(d)(1). Somewhat similarly, in order to terminate parental rights pursuant to Iowa Code section 232.116(1)(i) the court must find that "[t]he child meets the definition of child in need of assistance based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of one or both parents." Iowa Code § 232.116(1)(i)(1). "Sexual abuse means the commission of a sex offense as defined by the penal law." Iowa Code § 232.2(49). The record contains no finding, and no evidence, that either of the children was sexually abused, and sexual abuse is not involved in any of the three provisions pursuant to which the children were adjudicated CINA. "'Physical abuse or neglect' or 'abuse or neglect' means any nonaccidental

physical injury suffered by a child as the result of acts or omissions of the child's parent . . . ." *Id.* § 232.2(42). Rebekah argues, as she did in the juvenile court, that the record contains no evidence that either of the children suffered a "nonaccidental physical injury."

In finding that the children had suffered such a nonaccidental physical injury, the juvenile court cited and relied upon the deplorable living conditions in the home the children had shared with their parents, and the death of baby L.W. We do not believe that the living conditions themselves, as deplorable as they were, constitute a "nonaccidental physical injury" to Z.W. or M.W. We readily agree with the court that baby's L.W.'s death through parental neglect and resulting malnutrition and dehydration constitutes a most serious "nonaccidental physical injury." However, the terms "the child" in section 232.116(1)(d)(1) and "[t]he child" in section 232.116(1)(i)(1) refer to a child who is a subject of the termination proceeding. L.W. is not. Further, although L.W. is a "member of the same family" as Z.W. and M.W., *see* section 232.116(1)(d)(1), nothing in the record indicates L.W. was ever adjudicated a CINA.

We agree with Rebekah that termination of her parental rights to the children pursuant to sections 232.116(1)(d) and (i) cannot stand. We therefore reverse that part of the juvenile court's ruling and order. Because those two provisions are the only grounds relied on by the juvenile court for termination of

Rebekah's parental rights as to Z.W., we reverse the termination of her parental rights to Z.W.[2]

Because the juvenile court's rulings dealt with both Z.W. and M.W., our subsequent discussion often refers to "the children." However, because we have concluded termination of Rebekah's rights to Z.W. must be reversed, the remainder of our decision relates solely to issues concerning M.W.

Upon their removal on April 29, 2014, the children's physical custody was placed in family foster care with nonrelatives, subject to DHS supervision. About four months later, in the CINA proceeding, Rebekah sought modification to change legal custody of the children from the DHS to Rebekah's maternal aunt and the aunt's spouse. Following a hearing, the court denied her request. As of January 2015 the aunt and spouse had completed an adoptive home study and were approved and licensed as foster parents. In February 2015, the children's physical custody was placed with the aunt and spouse, as potential adoptive parents.

Additional facts will be noted in discussion of Rebekah's remaining numerous contentions of juvenile court error.

---

[2] We have considered whether we may on appeal, if that ground has been proved by the evidence, terminate Rebekah's parental rights to Z.W. pursuant to section 232.116(1)(h), a ground pled by the State but not relied on by the juvenile court. The State apparently neither filed an Iowa Rule of Civil Procedure 1.904(2) motion seeking modification of the court's ruling to order termination pursuant to section 232.116(1)(h) as to Z.W., nor cross-appealed seeking appellate review of the court's failure to find that termination as to Z.W. was proved pursuant to that provision. We conclude that under these circumstances, we cannot on appeal order termination of her rights to Z.W. *See In re A.R. et al.*, 865 N.W.2d 619, 629-33 (Iowa Ct. App. 2015) (holding that where the State neither filed a rule 1.904(2) motion nor cross-appealed, we may not terminate on a ground not relied on by the juvenile court).

Rebekah contends the juvenile court erred in allowing the court appointed special advocate (CASA)/guardian ad litem (GAL) for the children to present an oral report to the court during closing arguments at the October 9, 2014 conclusion of the hearing on Rebekah's motion to modify disposition. The juvenile court made clear that it allowed the CASA/GAL to "make closing remarks and recommendations," which would not be considered as evidence. We agree with the State that a GAL, as a representative of the children, was properly allowed to make closing argument. We find no error in the court allowing the CASA/GAL to make closing argument, including recommendations concerning the motion before the court.

Rebekah contends the juvenile court erred in denying her motion to modify the dispositional order. She had requested that legal custody of the children be transferred from the DHS to her aunt and the aunt's spouse. Rebekah cites Iowa Code section 232.99(4) for the proposition the court is to make the least restrictive disposition appropriate, and that pursuant to sections 232.99(4) and 232.102(1)(a) legal custody with a relative is less restrictive than legal custody with the DHS.

At the time of the modification hearing a home study of the home of the aunt and spouse had been conditionally approved. The evidence showed that the aunt had been in Rebekah's apartment April 13, 2014, just sixteen days before baby L.W.'s death, believed the apartment to be clean, and apparently saw nothing wrong with L.W. The aunt was scheduled to take foster care classes, but the classes had not yet started.

We have earlier noted the deplorable, intolerable condition of the apartment in which the children were living on April 29, 2014, as well as L.W.'s condition at the time of his death on April 29. Evidence before the juvenile court showed that a leasing consultant for the apartment building indicated that in March 2014, the conditions in the apartment were awful: it contained rotting garbage and food wrappers, it reeked with the smell of cat urine and dirty diapers, and she found it hard to breathe inside. Other evidence showed that on March 20, 2014, a pest control employee entered the apartment and found it to be one of the worst he had ever encountered.

Under the circumstances shown, the juvenile court was properly skeptical about the aunt's indication that both the apartment and L.W. were fine on April 13, 2014. Although the court declined to modify the dispositional order at that time, it noted its denial did not prevent a relative placement in the future if such were determined to be in the children's best interest. After the aunt and spouse completed the adoptive home study process in January 2015, they were approved and licensed as foster parents, and the children were in fact placed with them in February 2015, with a recommendation they were suitable to adopt the children. "Before a dispositional order in a juvenile proceeding can be modified, the party seeking modification must first prove a substantial change in material circumstances, and that under the new conditions, a change is in the best interest of the child or children." *In re D.G.*, 704 N.W.2d 454, 458 (Iowa Ct. App. 2005). Under the circumstances shown by the evidence before the juvenile court, we agree with its conclusion that Rebekah did not meet her burden to

show there had been such a material change of circumstances since the July 2014 dispositional order such that it was in the children's best interest to change their legal custody from the DHS to her aunt and spouse.[3]

Rebekah contends the juvenile court erred in denying her motion to dismiss the petition for termination of her parental rights. She asserts the State failed to follow the conditions under which she agreed on January 30, 2015, to continue a dispositional review/permanency hearing scheduled for that date. She acknowledges the January 30 hearing was not reported and in support of her contention of error alleges the existence of facts that are not part of the record.

Our appellate rules provide that where there is no record of proceedings at a hearing or trial, the appellant "may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection," subject to objections or proposed amendments by the appellee, and any objections or proposed amendments are to be submitted to and ruled on by the district court. Iowa R. App. P. 6.806(1), (2), (3). It is Rebekah's obligation to provide us with "a record affirmatively disclosing the error relied upon." *See State v. Mudra*, 532 N.W.2d 765, 767 (Iowa 1995). By not providing such a record, Rebekah has waived error on this contention. *See id.*

Rebekah contends the juvenile court erred in admitting State's Exhibits 050 through 052 over her objections. The reports apparently relate to child

---

[3] We need not and do not address the question of whether the February 2015 placement of the children with the aunt and spouse renders moot Rebekah's complaint that the court did not do so in October 2014.

abuse assessments concerning children of a male (other than Michael) by whom she became pregnant early in these CINA proceedings and whose child she gave birth to during these CINA and termination proceedings. She argues the reports are not reports "relating to a child in a proceeding under this division" as required by Iowa Code section 232.96(6) for such reports to be admissible over a hearsay objection. She further argues they are not "relevant and material" as required by section 232.96(6) because there was no evidence she had any knowledge related to the reports.

As noted earlier, our review is de novo. On our de novo review we have not considered these reports and thus need not address the question of whether the juvenile court should have sustained Rebekah's objection to them.

Rebekah contends the juvenile court erred in denying her request for six more months to work toward reunification. She cites Iowa Code section 232.104(2)(b). This issue thus apparently relates to the outcome of the permanency hearing that was held jointly with the termination hearing. Rebekah argues, however, that "the issues of termination must be examined after the resolution of Rebekah's criminal charges."

Somewhat relatedly, Rebekah contends the juvenile court erred in finding termination was in the children's best interest, and the better course would have been to continue the termination hearing until after her criminal trial because of her "extraordinary progress." She asserts that the criminal charges were her only unresolved issue and argues the children's long-term best interest would be

served by continuing the termination hearing until after the criminal trial was concluded.

In September 2014, Rebekah was charged with criminal child endangerment resulting in L.W.'s death, and with criminal neglect of L.W. and the children. At the time of the May 2015 permanency/termination hearing, her trial had been continued several times and the charges were unresolved. Rebekah had suffered from domestic violence, mental health problems, including dependent personality features, and substance abuse. She had been offered services at the time of L.W.'s birth but had declined. Rebekah had exhibited instability and dependence, and by developing a new relationship and becoming pregnant shortly after the children were removed, had exhibited a lack of focus on the children and possible reunification. The juvenile court had concluded she was a caretaker of the children and baby L.W. at the time of L.W.'s death from neglect, malnutrition, and dehydration. Although Rebekah acknowledged she bore some responsibility for the circumstances of L.W. and the children by allowing Michael to ignore their needs and neglect them, she had not acknowledged her own individual responsibility to have assured they were properly cared for and their needs met. The child born to Rebekah in March 2015 had been removed and was in foster care. Rebekah struggled with parenting the children and her newborn at the same time (during visitations). Although she had participated in many services and met certain goals, there was a lingering concern that she was not internalizing the things she was working on. The juvenile court found, in part:

Many of the same circumstances which existed at the time of the initial removal of [M.W. and Z.W.] remain to date. Rebekah is nearly 100% dependent on others to meet her financial and emotional needs. She has not addressed co-dependency and she has engaged in another relationship shortly after baby [L.W.'s] death and became pregnant with her fourth child . . . . Rebekah initially identified two males as potential fathers of [her new child]. One male has been eliminated through DNA testing.

. . . .

For purposes of a permanency hearing regarding [M.W. and Z.W.], the Court does not find that allowing the parents an additional six months to work toward reunification is in the best interests of the children, nor does the Court believe an additional six months will eliminate the conditions which existed at the time of the adjudication.

. . . .

. . . This Court finds that it would be in the best interests of [M.W. and Z.W.] to terminate the parent-child relationships so they will have the opportunity to grow and mature in a safe, healthy and stimulating environment.

Upon our de novo review, we agree with the juvenile court's denial of a six-month extension. Subject to resolution of remaining issues, we also agree that if termination is otherwise appropriate it is in the children's best interest.

Rebekah contends the juvenile court erred in denying her motion for increased visitation and thus erred in finding the State made reasonable efforts to reunify. These contentions relate to decisions by the court concerning visitation during the CINA case and argument made at the termination hearing.

Rebekah had two supervised two-hour visits per week. She sought longer visitations, including visitations in her home, and sought a trial home placement. However, she struggled with parenting the children and her newborn at the same time. The children exhibited negative, disruptive behavior after visits. Rebekah continued a somewhat unstable lifestyle. She did not acknowledge any personal, individual responsibility for L.W.'s death or the deplorable living conditions at the

time of his death and the children's removal. We find no error in the juvenile court's denial of increased visitations and thus no failure to make reasonable efforts toward reunification.

Rebekah contends the juvenile court erred in denying her alternative permanency request for guardianship with relatives under section 232.104(2)(d)(1). She argues that, contrary to the court's finding, termination is not in the children's best interest at the present. We have above concluded that if termination is otherwise appropriate it is in the children's best interest. Rebekah further argues that while her relatives prefer adoption to a guardianship, they are willing to be guardians and that if she is denied a six-month extension, the children should be placed in the guardianship and custody of her aunt and aunt's spouse. We have above affirmed the juvenile court's denial of a six-month extension. The juvenile court concluded, among other things, that:

> Rebekah's request for a guardianship with a relative is not an appropriate permanency option in this case. Guardianship is not a legally preferable alternative to termination of parental rights and adoption. Termination is the preferable solution when a parent is unable to regain custody within the time frames of chapter 232. An appropriate determination to terminate a parent-child relationship is not to be countermanded by the ability and willingness of a family relative to take the child. The children's best interests are served by a termination of parental rights rather than a guardianship to allow the children to remain in a permanent, stable, and safe home.

(Quotations and citations omitted). We agree with the juvenile court, and affirm on this issue.

Rebekah contends the juvenile court erred in terminating her parental rights to M.W. under section 232.116(1)(h). She argues the evidence does not satisfy the fourth element of that provision, clear and convincing evidence that

[M.W.] cannot be returned to her custody as provided in section 232.102 at the present time. That element is proved when the evidence shows the child cannot at the time of the termination hearing be returned to the parent without remaining a CINA. *In re R.R.K.*, 544 N.W.2d 274, 277 (Iowa Ct. App. 1995). The threat of probable harm will justify termination of parental rights, and the perceived harm need not be the one that supported the child's removal from the home. *In re M.M.*, 482 N.W.2d 812, 814 (Iowa 1992).

As noted above, Rebekah had not acknowledged any personal, individual responsibility for L.W.'s death or the children's intolerable living conditions. She struggled with parenting the children and her newborn. We fully agree with the juvenile court that M.W. could not be returned to her without remaining a CINA and thus affirm on this issue.

Rebekah contends the juvenile court erred in finding termination of her parental rights appropriate under section 232.116(3) because relatives should have had legal custody and because termination would be detrimental to the children due to the closeness of the parent-child relationship.

We have above dealt with issues concerning legal custody and guardianship in the relatives, Rebekah's aunt and spouse, and will not revisit those issues here.

Rebekah argues there were clear bonds between her and the children and it would be detrimental to them to terminate her parental rights. A court need not order otherwise justifiable termination if "[t]here is clear and convincing evidence

that termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c).

The provisions of section 232.116(3) are permissive, not mandatory. *In re J.L.W.*, 570 N.W.2d 778, 781 (Iowa Ct. App. 1997), *overruled on other grounds by P.L.*, 778 N.W.2d at 40. The court uses its best judgment in applying the factors contained in the statute. *P.L.*, 778 N.W.2d at 40. A court has the discretion, based on the unique circumstances of the case and the best interests of the child, as to whether to apply this section to save the parent-child relationship. *In re D.S.*, 806 N.W.2d 458, 475 (Iowa Ct. App. 2011).

The evidence does show some bond between Rebekah and the children. However, the children are very young, have been removed for over a year, are thriving in the care of the aunt and spouse, and are adoptable. The aunt and her spouse desire to adopt them. The children could not be returned to Rebekah at the time of the termination hearing. As noted by the juvenile court, the children need and deserve permanency and stability in their lives. They need it now, not at some indefinite point in the future. We conclude that although there is some bond between Rebekah and the children, under the circumstances shown there is not clear and convincing evidence that termination would be detrimental to them.

We affirm the termination Rebekah's parental rights as to M.W. and reverse the termination of her parental rights as to Z.W.

**AFFIRMED IN PART AND REVERSED IN PART.**